242 N.J. Super. 329 (1990)
576 A.2d 926
DOWNTOWN RESIDENTS FOR SANE DEVELOPMENT, AN UNINCORPORATED ASSOCIATION, ET AL., PLAINTIFFS-APPELLANTS,
v.
THE CITY OF HOBOKEN AND THE COUNCIL OF THE CITY OF HOBOKEN, DEFENDANTS-RESPONDENTS, AND APPLIED DEVELOPMENT ASSOCIATES, INC., DEFENDANT/INTERVENOR-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 1989.
Decided July 5, 1990.
*331 Before Judges PRESSLER, LONG and LANDAU.
Gerald J. Muller argued the cause for appellants (Miller, Porter & Muller, attorneys; Gerald J. Muller on the brief).
Eugene P. O'Connell argued the cause for respondents (Eugene P. O'Connell, Director, Department of Law of City of Hoboken, attorney; Eugene P. O'Connell on the brief).
*332 Morris Stern argued the cause for intervenor-respondent (Stern, Dubrow & Marcus, attorneys; Morris Stern and Philip D. Stern on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
Downtown Residents for Sane Development (Residents), plaintiffs in an action in lieu of prerogative writs, appeal from a summary judgment entered in favor of defendants The City of Hoboken (City), The Council of the City of Hoboken (Council) and defendant-intervenor Applied Development Associates, Inc. (Applied). Residents challenge the Observer Highway Redevelopment Plan (Plan) adopted in April 1988 by the City Council after extensive hearings and litigation.
Applied, the redeveloper, was permitted to intervene as a defendant by consent. Documents submitted in a related but not congruent suit before the same trial judge were made part of the present record, because the cross motions for summary judgment in both suits were heard and decided at the same time.
We begin by stating Residents' burden in a matter of this nature. A presumption of validity and constitutionality attends every legislative decision. In order for Residents to prevail in setting aside the questioned Plan, the legislative decisions made must be more than debatable, they must be shown to be arbitrary or capricious, contrary to law, or unconstitutional. See Hutton Park Gardens v. Town Council of West Orange, 68 N.J. 543, 564, 350 A.2d 1 (1975); Kozesnik v. Montgomery Tp., 24 N.J. 154, 167, 131 A.2d 1 (1957). Thus, even though every motion for summary judgment must be considered under the demanding test of R. 4:46-2, as interpreted in Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954), in order for Residents to have survived summary judgment the undisputed facts and disputed facts of record, if believed, must together have been sufficient to sustain *333 a finding of arbitrary or unlawful action. It is not enough to show that the legislative determinations were debatable.

FACTS
Applied and its affiliated entities have been successful developers and managers of approximately 1,500 units of subsidized housing in the City of Hoboken since 1972 when the Hoboken City Council declared a 20-block area blighted pursuant to N.J.S.A. 40:55-21.1 to 21.14 (The Blighted Area Act). During that time Hoboken and the blighted area have experienced substantial revitalization. In October of 1987, following extensive public input and planning board review, the City adopted a Redevelopment Plan primarily for three city-owned parcels on Observer Highway at the south end of the area covered by the declaration of blight. The parcels are also at the southern border of the City. The Plan expressed a purpose, not merely to continue the blight remediation program, but also to address an urgent need for affordable housing in the City. Litigation ensued, and following further public hearings, the City adopted the present Redevelopment Plan on April 6, 1988. Its objectives were similar.
Acting in its capacity as the redevelopment agency pursuant to N.J.S.A. 40:55C-12, the City Council designated Applied as redeveloper. Applied, together with the City, had secured a major federal Housing Development Action Grant (HODAG) in 1986. The HODAG was premised on commencement of construction of 115 affordable housing units no later than September 28, 1988. Applied was nonetheless required to participate in the competitive process for designation by submitting a proposal. After the Council adopted the Redevelopment Plan in April 1988 and designated Applied, serious environmental and other problems threatened to block the two-site 415 unit project contemplated. Indeed, Hartz Industries, Applied's original coventurer, dropped out and Applied continued as sole designee as of December 1988.
*334 Applied finally secured environmental approvals necessary to enable it to commence work on one 115-unit affordable housing project on Observer Highway, barely in time to meet the federal HODAG deadline.
A Hudson Street 300-unit project was also approved for development by Applied. It is proposed that it will contain 145 market rate units, 30 low income units, and 120 affordable controlled middle income units. Under the Land Disposition Agreement which governs transfer of the Observer Highway unit property to Applied, it is required to construct 53 low income units in this project, except that 30 may be built at Hudson Street if that project is developed, subject to approval of the Mayor and Council.
Hudson Street's affordable units cannot be converted to condominium status for fifteen years. The 115-unit Observer Highway Project cannot be so converted for twenty years. Significantly for Hoboken, no real estate tax abatements were proposed or given for the projects.
The revitalization in the area of blight includes a neighborhood immediately adjacent to the Observer Highway Project. The project was required to be designed so that the tallest portions abut closely the north side of a wide road known as Observer Highway, away from the residential areas to the north. There are open railroad yards on the southern side of Observer Highway.
It is not disputed that on September 11, 1987 Applied's principal sponsored a boat ride attended by approximately 275 tenants and employees of Applied, as well as by seven of the nine City Council members. A number of competing developers were also in attendance. During the boat ride, a model of the proposed project was on display, and the project architect, who had designed the Battery Park City Project, was also present. During the boat ride Applied's principal used the boat's loudspeaker to call attention to Battery Park City, noting similarities *335 with the proposed Observer Highway Project and noting, too, advantages of high rise construction.
An affidavit filed in this cause by the community planning consultant retained by Residents expresses the view that the area originally delineated as blighted in 1972 no longer required "the special incentives provided by use of a Blight Declaration and associated Redevelopment Plan ..." She offered her opinion that the Redevelopment Plan was inconsistent with Hoboken's Master Plan. However, in 1987 the Hoboken Planning Board found the earlier stage of the Redevelopment Plan to be consistent with its Master Plan, as did the Mayor and Council in 1988. We note particularly that the plan encouraged selection of a developer based upon the extent of achievement of the purpose of providing affordable housing and provision of low income units in the plan. Thus, it was initially provided that:
Priority will be given to development proposals which provide more than 23 units for such low income families at rentals or with monthly carrying charges which permit housing families whose incomes do not exceed 80% of 50% of the median income.
The proposed development must provide that at least 20% of these 115 units are three-bedroom units and 45% are two-bedroom units. The rest must be one-bedroom units. For low income units, priority will be given to development proposals that provide that more than 20% of such units have three bedrooms.
The City of Hoboken is recipient of a HoDAG grant of $3,000,000 for the development of the 23 low income units. The standards set forth in that grant award shall be regarded as minimum standards with regard to the number of low income units and the percentage of two and three bedroom units.
The affordability of the 115 units shall be guaranteed for a period of no less than twenty years from the date at which the apartment is first occupied. During that period, rent increases for the 115 units shall not exceed actual increases in operating expenses, as certified by the manager of the units and approved by the Hoboken Rent Levelling Board or its successor institution.
Hoboken residents or persons with business or family relations in Hoboken shall be given preference for the 115 units.
In determining eligibility for the 23 or more low income units, the total family income of the occupant shall not exceed the limits established by the U.S. Department of Housing and Urban Development for "very low income" persons. For the balance of the 115 units, persons whose incomes exceed the annual rent of the unit, as set forth above, divided by .30 in the case of rental or cooperative housing, or the annual carrying charges and real property taxes of *336 the unit divided by .28 in the case of condominium housing shall not be eligible. However, in the case that the development is financed through or in connection with a federal or state governmental program which has its own income standards for low, moderate or middle income housing eligibility, the income eligibility requirements associated with the program shall apply.
Occupancy standards (number of persons/apartment unit) for the 115 units shall be such standards as have been established by the U.S. Department of Housing and Urban Development.
Prospective occupants of the 115 units shall not spend more than 35% of their annual income in rent for rental or cooperative units of 33% of their annual income for carrying charges for condominium units. All incomes must be certified annually and reported to the Community Development Agency.
The average net unit size for all apartment units shall not be less than 750 square feet with no unit smaller than 415 square feet. Commercial and office space in the redevelopment area will be permitted at a rate of no more than 5% of the total square footage of the proposed development.
All properties developed under this plan shall be expected to pay full taxes according to assessed valuation.
The new residential development must include public sidewalks and walkways, gardens and passive recreation areas to ease pedestrian traffic and create comfortable sitting areas. Priority shall be given to development proposals which create and maximize opportunities for open space and active and passive recreation areas and provide at least 26,150 square feet of such open space. Development and maintenance of such sidewalks, walkways, gardens and passive recreation areas shall be the responsibility of the selected developer.
The Plan statement of need reflects recognition that there is remaining blight along the southern perimeter of Hoboken and emphasizes the need for more affordable housing for low, moderate and middle income families. Specifically, it recites that, "By action or inaction, a municipal government cannot allow its city to turn itself over to a new population. It is morally obliged to invoke every statutory authority, employ all of its powers and marshall its resources to create affordable housing." The Plan emphasized the special responsibility of the City to offer leadership in development by assuring that city-owned property was used to fulfill municipal needs, while complying with a pattern of limiting construction of high rise and higher density development to sites located on the perimeter of the City.
Certain further amendments to the Plan were made before finalization, but these affect positively many of Residents' *337 concerns. The building height has been materially diminished. By reason of discovery of environmental problems arising from past toxic pollution, only 115 units are being built on Observer Highway, materially lessening projected population density and the possibility of related parking and traffic impacts predicted by Residents from the Plan.
The record also discloses that as far back as 1972, when the initial declaration of blight was made, the Urban Renewal Plan for the Neighborhood Development Area given blighted area treatment contemplated that the three blocks bounded by Observer Highway, Willow Avenue and Bloomfield Street were designated for future residential use. In fact, apartment houses with maximum density far exceeding the present Plan were also contemplated. Development has proceeded progressively in the blighted area, the last project built pursuant to the 1972 declaration having been completed in 1984, not long before steps towards the present Plan commenced. When this Plan was approved, the Council again stated that blight persisted on the southern border of the original blight area.

LAW
On appeal Residents assert that it was wrong to grant summary judgment on all issues, and that the trial judge failed to make any findings of fact or conclusions of law respecting whether the Development Plan was arbitrary and capricious because it was out of character with the surrounding area and inadequately grounded in contemporary studies. An affidavit submitted by their professional planner was urged to create the factual basis for dispute as to the reasonableness of the new zoning, and a showing that it was inconsistent with the Hoboken Master Plan.
Residents point to the requirement for particularized findings contained in R. 4:46-2, to the necessity that the nonmoving party be given the benefit of all reasonable inferences, and to the comment in Odabash v. Mayor and Council of *338 Dumont, 65 N.J. 115, 121 n. 4, 319 A.2d 712 (1974) that, "[s]ummary judgment is generally inappropriate" where there is a claim that zoning is arbitrary and capricious. Citing Pressler, Current N.J. Court Rules, Comment R. 4:46-2 (1990), they argue that summary judgment is inappropriate in prerogative writ litigation involving an attack on the constitutionality of a zoning ordinance.
Here, however, a zoning ordinance is not involved in the sense of being an initial legislative determination heretofore untested. The critical legislative determination in this case was made in 1972, a declaration of blight in the area. It is entirely reasonable, in our view, to utilize this 1972 declaration as a basis for determining whether the present Plan was arbitrary and capricious.
Residents would have us apply here the same review standards applicable to untested zoning ordinances, in which it may well be proper to discourage summary judgment where there is conflicting evidence of record. However, courts must also recognize that the power to delay, particularly where multiple approvals within a government or financial institution-established timetable are required for a development, is the power to destroy.
As we have pointed out above, we review this record not merely to inquire whether there are legitimate bases for differing opinions, but in the context of whether the objectors have produced enough facts to raise a possibility that the legislative determination was clearly unrelated to valid municipal concerns and thus arbitrary, capricious or illegal.[1] Putting it another way, all that the municipality needed to secure summary judgment on this point was a showing of some reasonable basis for its legislative action. Considering the unassailable proof in the record that the questioned Plan will provide urgently needed affordable housing, the expressed rational legislative scheme of *339 arranging higher rise housing on the City periphery, and the existence of a 1972 plan coinciding with the original declaration of blight which even then contemplated that the several block area of the current plan be developed for high density apartment usage, we hold, in exercise of our original jurisdiction (see R. 2:10-5) that the April 6, 1988 ordinance adopting the Plan and the subsequent amendments are not, as a matter of law, arbitrary, capricious or unreasonable.
In granting Applied's motion for judgment on all counts, the trial judge saw the basic issue as "... the right of the Court to look over the shoulder of the City.... If there is a basis for what the City did, then the general rule is that the Courts cannot substitute their judgment." The trial judge found that the Council's adoption of the Redevelopment Plan was made in good faith and with the best interests of the City in mind. He found that the actions taken by the Council were statutorily authorized and not arbitrary, capricious or illegal. He found that there was no abuse of discretion which would warrant a judicial intervention. We agree.
The City recognized that gentrification was forcing out its lower income residents. Legislative recognition of this perceived problem was in accordance with established state planning policy, N.J.S.A. 40:55D-2(g); N.J.S.A. 52:27D-302, and with the policy of N.J.S.A. 40:55C-17, as amended, which recognizes supply of and demand for housing as a factor in preventing blight.
Moreover, we reject the notion, implicit in Residents' arguments, that partial success realized in the progressive implementation of a blight removal program must doom completion of the program because the originally identified area of blight is no longer principally blighted. Residents take issue with what they perceive to be an indication by the trial judge that a declaration of blight necessarily continues in perpetuity. We do not think that this was the intent of his opinion. To the extent it may so be read, we disagree. The appropriate legislative *340 authority may reconsider such declaration. Courts, however, should not interfere when the legislative process recognizes remaining areas of previously identified blight which can be addressed by redevelopment serving valid municipal goals. "Rome wasn't built in a day," goes the old saying. Neither could it be rebuilt in a day. Mere passage of time does not erase validity of a blighted area designation. See Freeman v. Paterson Redevelopment Agency, 128 N.J. Super. 448, 320 A.2d 228 (Law Div. 1974), rev'd on other grounds, 138 N.J. Super. 539, 351 A.2d 765 (App.Div. 1976).
It is instructive to consider the kind of blight case in which summary judgment has been determined to be inappropriate. In Eighth & Walnut Corp. v. Public Library of Cincinnati, 57 Ohio App.2d 137, 385 N.E.2d 1324 (1977), the Court of Appeals of Ohio recognized that a plan of urban renewal must address the problem of correcting urban blight. Thus, where there was evidence which, if believed, would establish that discretion in adoption of an urban renewal plan was not done in aid of its purpose to eliminate slums and blight but rather to accommodate the desire of a library to expand its facilities, grant of summary judgment was set aside. Significantly, the Ohio Court recognized, as we have, that courts must be reluctant to interfere with any plans for renewal that may be adopted to deal with a determined blight. It stated, "It is wholly inappropriate for any court to substitute its judgment for that of the legislative body of the city in an area appropriate for legislative determination, or to interpose, without clear and convincing reason to do so, its authority between council and the citizens of the city, to frustrate a determination and plan so adopted." Id. 385 N.E.2d at 1330. Our review of the arguments, and of the record, satisfies us that Residents' principal argument, upon analysis, really goes to the question of wisdom of the Plan when balanced against conflicting planning considerations. This is a judgment we may not make. See Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).
*341 Residents also contend that the boat ride attended by seven members of the Hoboken City Council violated the Open Public Meetings Act, N.J.S.A. 10:4-6, et seq.; that the trial judge failed to make any findings of fact or conclusions of law respecting Residents' assertion that the sale of Hoboken property to Applied was below fair market value in violation of public trust; and finally that the court failed to make findings of fact and state conclusions of law respecting Residents' claim that the Redevelopment Plan violates HUD regulations because it extends a residency preference. These contentions are clearly without merit. R. 2:11-3(e)(1)(E).
As to the allegation of improper sale, we note that there was no affidavit by Residents to contravene the record showing of an appraisal supporting the City's price for the land at use value. There must be more than a mere allegation in pleadings to warrant a court's consideration as a basis for denying an otherwise supported motion for summary judgment. Judson, supra, 17 N.J. 67, 75, 110 A.2d 24 (1954). As to the residency issue, we note that there is no residency requirement set forth in the Plan, although a preference for Hoboken residents is indicated. We do not undertake to determine whether this complies or does not comply with regulations of the Department of Housing and Urban Development. This is a matter for HUD to determine, and we presume that it will not approve final plans if there are violations of its applicable regulations.
Finally, we agree with the trial judge's findings respecting the absence of any Open Public Meetings Act violation. The dissimilarity of the Circle Line boat ride, attended by hundreds of people, including Applied's competitors, from the facts in a case like South Harrison, Tp. Comm. v. Bd. of Chosen Freeholders, 210 N.J. Super. 370, 510 A.2d 42 (App.Div. 1986), is profound. Unlike South Harrison, Residents made no showing that a meeting occurred, nor that any meeting occurred *342 in secrecy. Moreover, there was no showing that any actions were taken or decided during the excursion.
Our resolution of the above issues makes unnecessary consideration of Residents' argument that failure to grant their motion for summary judgment was error. We affirm the grant of summary judgment on all counts.
NOTES
[1] See Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 212 A.2d 153 (1965).