872 A.2d 125 (2005)
377 N.J. Super. 209
INFINITY BROADCASTING CORPORATION and Inner City Broadcasting Corporation, Appellants,
v.
NEW JERSEY MEADOWLANDS COMMISSION, Respondent, and
Encap Golf Holdings, LLC, Intervenor/Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 2004.
Decided May 5, 2005.
*127 Kenneth D. McPherson, Jr., Secaucus, argued the cause for appellants (Waters, McPherson, McNeill, attorneys; Mr. McPherson, of counsel; Eric D. McCullough and Joseph W. Grather, Morristown, on the brief).
Valerie W. Haynes, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Michael J. Haas, Assistant Attorney *128 General, of counsel; Ms. Haynes, on the brief).
Gregory J. Bevelock, Teaneck, argued the cause for intervenor (DeCotiis, Fitzpatrick, Cole & Wisler, attorneys; Eric D. Wisler, of counsel; Mr. Bevelock, of counsel and on the brief).
Before Judges KESTIN, ALLEY and FALCONE.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
Infinity Broadcasting Corporation (Infinity) and Inner City Broadcasting Corporation (Inner City), invoking Rule 2:23(a)(2), appeal from resolutions of the Meadowlands Commission adopting amendments to a redevelopment agreement with EnCap Golf Holdings, L.L.C. (EnCap) relating to a portion of the Hackensack Meadowlands District. After the appeal was initiated, we granted EnCap's motion to intervene as a respondent.
The agreement between the Commission and EnCap initially addressed plans for commercial, recreational and residential uses but did not establish a particular project design or site plan. Infinity and Inner City each own property within the District bordering the project area. They operate radio stations broadcasting from towers on those properties. The Commission held hearings on proposed amendments to the redevelopment agreement, at which representatives of Infinity and Inner City testified and submitted expert reports opining that the proposed buildings in the project area had the potential for interfering with the radio stations' broadcast signals to the extent, possibly, of requiring the radio stations to cease operations. Infinity and Inner City sought, inter alia, the imposition of specific limits on building heights, but the Commission adopted the resolutions without such limitations.
On appeal, Infinity and Inner City claim violations of administrative due process, specifically that they were unduly limited in their presentations at the hearing, and that the amendatory resolutions were based on insufficient findings. They contend that the result reached was fundamentally flawed because the Commission acted arbitrarily and capriciously in adopting the resolutions without reference to the effect the contemplated construction would have on the radio stations. Specifically, Infinity and Inner City argue that the Commission did not fully consider the expert reports offered by Infinity and Inner City; took no account of the property values affected by the proposed construction or whether relocation of the radio stations would be required; and failed to consider whether the purposes of the redevelopment plan could be accomplished by relocating structures of a height that interfered with the radio signals.
Infinity and Inner City also argue that the resolutions violated basic principles of land use law, that the Commission's failure to ensure the absence of interference with their signals effected a taking of their property, and that the administrative action resulted in a regulation of appellants' abilities to broadcast their signals that violated exclusive federal jurisdiction over broadcasting.
Appellants seek a remand to the Law Division for the development of a record and decision. We conclude that the administrative action challenged is not amenable to review in this court at this time. Accordingly, we dismiss the appeal without prejudice to the rights of Infinity and Inner City to vindicate their claims in a proceeding in lieu of prerogative writs in the Law Division.
*129 The Commission is a political subdivision of the State created to govern the District. See N.J.S.A. 13:17-5. Among the powers conferred by the Legislature on the Commission are the acquisition and development of property, see N.J.S.A. 13:17-6(g), and the authority to regulate the use of land in the District through adoption of a master plan, see N.J.S.A. 13:17-9, and in other ways. See generally, N.J.S.A. 13:17-9 to -22. The Commission's regulations have established numerous zones, and specially planned areas in the District.[*] Radio towers have not been a permitted use in the light industrial and distribution zones in place at the time of the events depicted here. These zones had no specified height limits for structures, but some height limits did exist that were more or less pervasive from zone to zone.
On October 26, 2000, the Commission and EnCap entered into a landfill closure and development agreement ("the agreement"), encompassing a two-phase project to redevelop six landfills within the District ("the project") on sites leased from the Commission. In phase one, Encap would close and cap four landfills, and construct a thirty-six-hole golf course facility and "related amenities", such as a hotel or resort complex of 330 to 650 rooms. At EnCap's option, it could also construct up to 1356 apartments or townhouses that would be sold as timeshare units. Phase 2, if EnCap chose to pursue it, would require EnCap to close and cap the remaining landfills and construct another thirty-six-hole golf course facility. The agreement also allowed EnCap to propose additional projects.
In January 2001, the Commission announced the redevelopment plan resulting from the agreement with EnCap and adopted it on February 28, 2001. The plan outlined the project as encompassing five sites with similar redevelopment needs, totaling approximately 1330 acres. It recited that existing uses in the project area included landfills, radio towers, public utilities, and the Commission's offices; while nearby uses were residences, offices, commercial and industrial activities, warehouses, and a cemetery. The plan further explained that the Commission believed a project that emphasized golf courses was the best way to achieve, within "a reasonable time frame," its objectives of closing the landfills, making environmental improvements to the existing wetlands and wildlife management areas, and promoting economic development that would appeal to residents of the immediate area and "complement the large corporate sector located in and around" the area.
At least half of the project area would be reserved for open space. The golf courses would count as open space, but at least fifteen percent of the total project area had to be other open space. The maximum height of all buildings was limited to twenty-five stories, exclusive of roof-top mechanical equipment or antennas.
Infinity and Inner City each operate AM radio stations, respectively WINS and WLIB, located on properties they own in the district but which are outside the redevelopment area. Both stations use towers to broadcast their signals. The towers are less than two-thirds of a mile apart from each other. They predate the Legislature's creation of the District and the establishment of the Commission's zoning authority.
Infinity's tower is in a zone that was designated as "service highway commercial." That tower is no more than a few *130 hundred feet away from the redevelopment area. It is bordered mostly by other lots in that zone, but also by zones designated for relatively small light industrial and distribution uses  where radio towers are a "special exception" use  and commercial park uses.
Inner City's tower is in a zone that was designated as "parkside residential." That tower is bordered on two sides by the area that was designated as a "service highway commercial" zone which includes Infinity's lot. Inner City's tower is not near a light industrial and distribution zone. A small part of Inner City's lot lies within the redevelopment area. That part is not needed for the radio station's use, and the Commission is engaged in acquiring it in a separate condemnation proceeding.
In August 2001, the Commission, pursuant to a revised plan from EnCap, proposed amendments to the agreement in respect of Phase 1. A public hearing was held on August 21, 2001.
On September 6, 2001, a radio frequency expert prepared a report for Infinity and Inner City examining the impact of the amended development plan on the radio stations' broadcasting. Infinity and Inner City, in turn, submitted that report to the Commission as a supplement to the public hearing record. The expert had opined, based upon a described analysis, that buildings constructed to the heights permitted in the project area "may have a significant adverse impact on the directional radiation patterns of WLIB and WINS[,]" which might require appellants to adjust their directional patterns, broadcast at reduced power, "or, in the extreme case, cease operation." He was able to estimate the effect on Infinity's broadcast signal of buildings up to 59 meters tall, the effect on Inner City's signal of buildings up to 50 meters tall, and how the effects would vary by a building's distance from the broadcast tower and by other characteristics of the structure. He used those estimates to prepare contour diagrams of the project area showing where buildings that were 15, 25, 35, and 45 meters tall could be located without significantly distorting the directional patterns of appellants' signals.
In a September 14 document, the Commission staff reported that it was analyzing the concerns expressed, had met with representatives of Infinity, Inner City and EnCap about the issues, and "encourage[d] further discussions amongst these parties during design and implementation of any structures proposed as part of the redevelopment plan." During the same time period, the Commission adopted a resolution that directed EnCap to work with the radio stations in and adjacent to the project area "to avoid signal interference to the greatest extent possible."
On December 19, 2001, the Commission and EnCap entered into a memorandum that incorporated the proposed amendments into their agreement. The memorandum added to Phase 1 an office complex of 750,000 to 1,200,000 square feet that had previously been envisioned as the subject of a separate development agreement. It also allowed EnCap to replace all or part of the timeshare component with "active adult housing," i.e., housing for occupants at least fifty-five years of age. That component was renamed the "residential component" and the maximum number of units was increased to 1400. In addition, the memorandum gave EnCap the option of constructing "village retail centers" totaling 100,000 square feet to serve the project's residential areas.
In March 2002, EnCap proposed further amendments to the agreement that would increase the allowable amount of office space from 1.2 to 1.3 million square feet, the hotel or resort from 600,000 to 660,000 *131 square feet, and the number of residential units from 1400 to 1500. Under those proposed amendments, the non-residential building height limit of twenty-five stories would be maintained, but there would be changes in dwelling unit standards that would permit as many as 150 additional residential units in buildings of six to fifteen stories.
On April 22, 2002, Infinity and Inner City wrote to the Commission expressing their concerns that residential structures of fifteen stories "may have a substantial impact on the radio tower transmissions[,]" i.e., "impacts [that] are very serious and can be extremely costly to remedy." They noted that they and EnCap were endeavoring to arrange a meeting about such matters, and they objected to any action by the Commission on the amendments before such a meeting occurred. These concerns and thoughts were re-expressed at a public hearing on April 23, 2002.
On May 9, 2002, Infinity and Inner City reported that a meeting with EnCap had occurred on May 7, 2002, and that representatives of the three entities were working on design modifications. The letter to the Commission stated that the record as it existed at the time was not adequate as a basis for a proper evaluation of the impacts of the proposed height increase and exhorted the Commission not to take action in that regard.
The broadcasters' radio frequency expert provided another report on May 23, 2002, analyzing the potential adverse impacts of fifteen-story residential buildings on the signals, as compared to four-story buildings in the same locations, which, he opined, would cause only minimal distortion. The expert also opined that the distortion from a fifteen-story building, alone, would be too severe to enable Inner City to adjust its nighttime directional pattern to allow for continued compliance with the technical requirements of its FCC license. He predicted that the other proposed residential buildings would cause "unacceptably high levels of pattern distortion" for both WLIB and WINS.
On June 24, the expert updated his report on the potential adverse impact of the thirty proposed buildings in the project that were more than four stories tall. He predicted that the pattern distortion would be too severe to permit adjustment of either station's directional pattern to comply with its FCC license. The problem could only be avoided, he opined, by significantly reducing the height of most of the buildings.
Once again, Infinity and Inner City urged the Commission not to act on the amendments until they had had an adequate opportunity to submit evidence on alternative ways to achieve the Commission's redevelopment objectives and keep the project economically viable without seriously impairing the broadcasting signals.
A Commission staff memorandum dated July 22, 2002, noted that appellants and EnCap had met to discuss the potential impact of the increased building heights "on ... existing tower configuration." The staff stated that it was reviewing the submissions of Infinity and Inner City.
On July 30, Infinity and Inner City sent the Commission a preliminary analysis from a professional planning firm that supported the radio frequency expert's analysis, again urging deferral of action on the amendments until the Commission had considered alternative designs that would minimize signal interference, or until it held a plenary hearing at which appellants and EnCap could present "all relevant facts and expert testimony."
On July 31, the Commission adopted the March 2002 amendments, reiterating the *132 direction to EnCap that it "shall work with the existing radio station[s] adjacent to the redevelopment area to avoid signal interference to the greatest extent possible."
On July 31, 2002, the Commission and EnCap entered into a "second memorandum of agreement" incorporating the March 2002 amendments. Some project-design standards had been changed but the only specific mention of height limitations was a restriction on parking facilities to seven stories.
By letter dated October 3, 2002, Infinity and Inner City again urged the Commission to defer action until they successfully negotiated a "reasonable resolution of the radio signal issue" with EnCap, or until the Commission independently evaluated the impact of the current project design on the radio signals and "such alternatives as may be available to mitigate those impacts." Infinity and Inner City had urged EnCap to respond to the radio frequency expert's reports.
In a public hearing on the same date, the radio stations' concerns were discussed. The Commission's staff characterized those concerns as "particular to the site layout" and suggested that they "may be more appropriately addressed during the site plan review portion of the process."
On November 25, EnCap certified that it had already worked with two other radio broadcasters in or near the project area to relocate their stations to areas where they "will not experience any signal interference." It further certified that it had held meetings with Infinity and Inner City toward a similar end, and that it was "exploring the possibility of relocation with" Inner City.
In December 2002, another set of amendments was proposed to reduce the amount of office space from 1.3 million to 750,000 square feet and to increase the number of residential units from 1500 to 1980. Those amendments introduced two new uses: residential support buildings, which could be as large as 35,000 square feet, and "commercial recreation space," which could be as large as 700,000 square feet.
The December 2002 amendments addressed height in detail, specifying that nonresidential structures could not be more than twenty-five stories. For the residential units, eighty percent had to be in buildings of no more than six stories, while ten percent could be in buildings of seven or eight stories and another ten percent could be in buildings of nine to fifteen stories. Parking facilities could be "7 levels in height."
On December 30, 2002, Infinity and Inner City informed the Commission that the radio frequency expert had completed his analysis of the feasibility of relocating Inner City's tower to the "Oritani Marsh" site, and had concluded that existing buildings would cause enough signal interference to make the site unsuitable "from a radio engineering standpoint." Infinity and Inner City proposed consideration of alternative sites. Their concerns were reiterated at a January 7, 2003 public meeting, at which they specified their fear that deferring full consideration of their objections until site-plan review would result in a loss of the opportunity to challenge the building heights, because the Commission would not be able to impose any height limitations that were not in the zoning regulations. The Commission's chief planner represented that consideration of the project was still at the "redevelopment plan" stage, which meant that the Commission was only "setting the ground rules" for the project's "overall concept."
The objections and reservations of Infinity and Inner City were once again expressed *133 at a public meeting on February 26, 2003. At the close of that meeting, however, the Commission adopted a resolution approving the December 2002 amendments. As before, EnCap was directed to "work with the existing radio station[s] adjacent to the redevelopment area to avoid signal interference to the greatest extent possible."
This appeal ensued.
We reject the arguments offered by Infinity and Inner City that are premised on contended violations of "administrative due process," including that the Commission was obliged to hold an evidentiary hearing and extend to these objectors the proof-development opportunities typically available in quasi-judicial proceedings. These appellants received all the process they were due on a consideration of the type in which the Commission was engaged.
Infinity and Inner City claim that the Commission's procedures were flawed in the due process sense when the March 2002 and December 2002 amendments were approved without specific findings about whether EnCap's buildings would interfere with the radio stations' broadcast signals. Infinity and Inner City contend the procedural shortcomings denied them the opportunity to contest adverse findings that the law guarantees to objectors with particularized property interests; and that the approval of the building heights set forth in the amendments was a final determination of their interests in broadcasting on their licensed frequencies. They argue that these characteristics rendered the matter quasi-adjudicative and a "contested case" under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15 (the "APA"). These arguments assume that the Commission impermissibly relied on undisclosed communications or submissions by EnCap, and Infinity and Inner City seek production of any such matter.
In addition, Infinity and Inner City claim that the Commission acted arbitrarily and capriciously by passing the challenged resolutions in the absence of findings about the radio signal interference the buildings would generate. They argue that even if this matter were considered quasi-legislative, the Commission acted arbitrarily and capriciously in making its determinations in the absence of findings about the effect on the radio signals of buildings constructed to the height limits in the amendments, and about the feasibility of relocating WINS and WLIB in light of the unchallenged evidence of their radio frequency expert. These contentions include the assertion that the absence of findings made respondent's action void for being unreviewable.
Administrative proceedings are generally characterized as quasi-adjudicative or quasi-legislative. A "contested case" under the APA is quasi-adjudicative. See Board of Educ. of Upper Freehold Reg'l Sch. Dist. v. State Health Benefits Comm'n, 314 N.J.Super. 486, 494, 715 A.2d 358 (App.Div.1998). When the administrative determination is quasi-adjudicative, a reviewing court must determine whether the findings were supported by sufficient credible evidence from the record as a whole, with "due regard" for assessments of witness credibility and for agency expertise where pertinent. See Riverside Gen. Hosp. v. Hospital Rate Setting Comm'n, 98 N.J. 458, 468, 487 A.2d 714 (1985); Mayflower Sec. Co. v. Bureau of Securities, Div. of Consumer Affairs, 64 N.J. 85, 92-93, 312 A.2d 497 (1973); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965).
By contrast, when the administrative determination in question is quasi-legislative, such as a municipality's adoption of a zoning ordinance or a redevelopment *134 plan, overturning the decision requires it to be not merely "debatable," but "arbitrary or capricious, contrary to law, or unconstitutional." Downtown Residents for Sane Devel. v. City of Hoboken, 242 N.J.Super. 329, 332, 576 A.2d 926 (App.Div.1990). The determination would be arbitrary if it were "predicated on unsupported findings." Bryant v. City of Atl. City, 309 N.J.Super. 596, 610, 707 A.2d 1072 (App.Div.1998). Accord, Witt v. Bor. of Maywood, 328 N.J.Super. 432, 442, 746 A.2d 73 (Law Div.1998), aff'd, 328 N.J.Super. 343, 746 A.2d 25 (App.Div. 2000). However, "municipal actions enjoy a presumption of validity," which is a "heavy burden" to overcome. Bryant, supra, 309 N.J.Super. at 610, 707 A.2d 1072; Witt, supra, 328 N.J.Super. at 442, 746 A.2d 73. Quasi-legislative bodies are presumed to act on the basis of adequate factual support, and the presumption is overcome only by showing that the record could not "`rationally support a conclusion that the enactment is in the public interest.'" Bryant, supra, 309 N.J.Super. at 610, 707 A.2d 1072 (quoting Hutton Park Gardens v. Town Council of W. Orange, 68 N.J. 543, 564-65, 350 A.2d 1 (1975)).
An administrative agency or a municipality does not exercise its quasi-legislative authority arbitrarily or capriciously if its choice between two actions is "exercised honestly and upon due consideration, even if an erroneous conclusion is reached." Bryant, supra, 309 N.J.Super. at 610, 707 A.2d 1072; accord, Witt, supra, 328 N.J.Super. at 442, 746 A.2d 73. A claim about the merits of the choice "really goes to the question of the wisdom of the [choice] when balanced against conflicting planning considerations," which is a judgment courts may not make. See Downtown, supra, 242 N.J.Super. at 338-40, 576 A.2d 926. "`[T]he fact that the question is debatable does not justify substitution of the judicial judgment for that of the local legislators.'" Forbes v. Board of Trustees of S. Orange, 312 N.J.Super. 519, 532, 712 A.2d 255 (App.Div.) (quoting Lyons v. City of Camden, 52 N.J. 89, 98, 243 A.2d 817 (1968)), certif. denied, 156 N.J. 411, 719 A.2d 642 (1998).
The "arbitrariness or illegality" standard for quasi-legislative action has been specifically applied to claims concerning the Meadowland Commission's adoption or modification of a master plan. See Meadowlands Reg'l Redevel. Agency v. State, 63 N.J. 35, 46, 304 A.2d 545, appeal dismissed, 414 U.S. 991, 94 S.Ct. 343, 38 L.Ed.2d 230 (1973); Kelly v. Hackensack Meadowlands Devel. Comm'n, 172 N.J.Super. 223, 228, 411 A.2d 727 (App.Div.), certif. denied, 85 N.J. 104, 425 A.2d 267 (1980).
Principles of due process require an administrative agency to provide "some form of hearing," meaning an opportunity to be heard "at a meaningful time and in a meaningful manner," before a person is "finally deprived of a property interest." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976) (citation omitted). Accord, Township of Montville v. Block 69, 74 N.J. 1, 8, 376 A.2d 909 (1977) (holding tax foreclosure invalid without adequate notice). A hearing of some kind is required in all cases in which a party seeks to protect its "vital interests," not just in those cases where the presence of "disputed adjudicative facts" compel a "formal trial procedure." High Horizons Devel. Co. v. State, Dep't of Transp., 120 N.J. 40, 52-53, 575 A.2d 1360 (1990). In general, principles of constitutional due process apply to the extent of requiring a hearing suited to addressing the question at issue. See Federal Communications Comm'n v. WJR, 337 U.S. 265, 275-77, 69 S.Ct. 1097, 1103-04, 93 L.Ed. 1353, 1360-61 (1949)(dealing with *135 proceedings involving the grant of radio broadcast licenses); Limongelli v. State Bd. of Dentistry, 137 N.J. 317, 325-26, 645 A.2d 677 (1993)(involving occupational licenses).
In addition, statutes may provide for a hearing in circumstances where due process does not mandate one. See High Horizons, supra, 120 N.J. at 46-47, 575 A.2d 1360. The APA provides the procedures when a hearing is required by statute or a constitutional provision, but it is not itself the source of the right to a hearing in any circumstance. See ibid.
In this instance, the Legislature has provided for public hearings before respondent adopts or amends a master plan. N.J.S.A. 13:17-9(a). This is not a requirement for a quasi-judicial, contested case, hearing, however. An adjudicatory proceeding is one that "determines the rights of specific individuals or a limited group of individuals." In re Issuance of Permit by DEP to Ciba-Geigy Corp., 120 N.J. 164, 171, 576 A.2d 784 (1990). See also Upper Freehold, supra, 314 N.J.Super. at 494, 715 A.2d 358 (construing N.J.S.A. 52:14B-2(b)) and quoting 37 N.J. Practice, Admin. Law and Practice § 119, at 137 (Steven L. Lefelt) (1988)(referring to the three-part test used for qualifying a matter as a "contested case" under the APA, that: a statute or constitutional provision requires a hearing; the result would be "an adjudication concerning rights, duties, obligations, privileges, benefits or other legal relations"; and the hearing would "involve specific parties rather than a large segment of the public").
By contrast with individualized determinations, the adoption of a redevelopment plan is quasi-legislative in character. See Downtown, supra, 242 N.J.Super. at 332, 576 A.2d 926. As we have explained in a context similar to this case, the Meadowlands Commission's adoption of amendments to the master plan for the district in the instant matter is not analogous to a board of adjustment's exercise of its variance power, but is rather "a purely legislative function" which is analogous, "if to anything at all, to a municipal governing body's power to zone and rezone." See Kelly, supra, 172 N.J.Super. at 228, 411 A.2d 727. This is so even though the action may have a particular impact on the rights of individual property-owners. See Downtown, supra, 242 N.J.Super. at 332, 576 A.2d 926 (city residents challenged adoption of redevelopment plan); Kelly, supra, 172 N.J.Super. at 227, 411 A.2d 727 (private property-owner joined challenge to respondent's rezoning of district); Mountcrest Estates, Inc. v. Mayor and Tp. Comm. of Rockaway, 96 N.J.Super. 149, 154, 232 A.2d 674 (App.Div.) (owner of tract challenged rezoning), certif. denied, 50 N.J. 295, 234 A.2d 402 (1967). The Commission's actions here were manifestly quasi-legislative notwithstanding their potential for particularized impact on Infinity and Inner City; and its proceedings, therefore, were not governed by the APA's requirements for the conduct of a "contested case."
In making quasi-legislative determinations, such as the adoption of zoning or master-plan amendments, an agency is not required "to act on the basis of findings of fact and conclusions of law supported by the record." Kelly, supra, 172 N.J.Super. at 228, 411 A.2d 727. Indeed, as a general matter, "there is no requirement that evidence be presented providing a factual foundation for the ordinance, and the governing body does not ordinarily make any findings of fact to justify its action." Hirth v. City of Hoboken, 337 N.J.Super. 149, 165-66, 766 A.2d 803 (App.Div.2001). Due process in this regard requires only the publication of notice and the holding of public hearings. Kelly, supra, 172 N.J.Super. at 229, 411 *136 A.2d 727. In In re Certain Amends. to the Solid Waste Management Plan of Hackensack Meadowlands Devel. Comm'n, 275 N.J.Super. 375, 646 A.2d 463 (App.Div.), certif. denied, 139 N.J. 289, 654 A.2d 470 (1994), we explained that the public notice of this Commission's amendments to the Hackensack Meadowlands District's solid waste management plan satisfied due process because it gave a sufficient description of the amendments for the challengers to request the additional materials that they needed "to submit detailed written and oral comments in opposition to the [Commission's] proposal, including a consultant's comments." Id. at 388, 646 A.2d 463.
Applying these standards, we conclude that the Commission, here, fulfilled its responsibilities by holding public hearings on the amendments, by providing enough information about the amendments for Infinity and Inner City to oppose them, and by receiving their comments and objections. To the extent the Commission relied on undisclosed communications from EnCap or on a staff recommendation in acting on the amendments, there is no bar to doing so when an agency acts quasi-legislatively.
There is also no need for more elaborate findings than were made in order to facilitate judicial review, because review of a quasi-legislative exercise, especially, requires no more than an ability to understand what action the agency took and why it did so. See In re Applic. of Howard Sav. Inst. of Newark, 32 N.J. 29, 53, 159 A.2d 113 (1960). Even though Howard involved the quasi-judicial conduct of an administrative agency, the Supreme Court held that if the material facts were not in dispute, the agency's decision would be sufficient for appellate review as long as "it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." Ibid. As the Court emphasized: "If it is apparent that we and the interested parties can and do understand fully the meaning of the decision and the reasons for it, no sufficient reason exists to remand for fuller and clearer findings and later reconsideration." Ibid.
It is, here, undisputed that the Commission determined not to constrain EnCap's planning with mandates relating to the potential impact on the radio stations of buildings that EnCap had yet to design or situate. It is also clear that the Commission believed such mandates were premature and that EnCap would follow its directive of working with the radio stations to minimize signal interference. There is no need for further information about the Commission's reasoning to support the conclusions that its resolutions were procedurally valid.
Consideration of the land use and takings issues Infinity and Inner City raise would be inappropriate on the record before us. To the extent they argue that the resolutions violated basic principles of land use law, Infinity and Inner City must seek to vindicate their positions in a trial court. Notwithstanding the Commission's existence as a State agency, because its land use authority is exercised on a local basis, its actions in that regard must be challenged in a proceeding in lieu of prerogative writs filed in the Law Division. See Township of Montclair v. Hughey, 222 N.J.Super. 441, 446-48, 537 A.2d 692 (App. Div.1987); Baldwin Constr. Co. v. Essex Cty. Bd. of Taxation, 27 N.J.Super. 240, 99 A.2d 214 (App.Div.1953); cf. In re Certain Amendments, 275 N.J.Super. 375, 387 n. 2, 646 A.2d 463 (App.Div.1994); Town of Secaucus v. Hackensack Meadowlands Dev. Comm'n, 267 N.J.Super. 361, 372 n. 1, 631 A.2d 959 (App.Div.1993); Walsh Trucking Co. v. Hackensack Meadowlands Dist. Construction Bd. of Appeals, 240 N.J.Super. 525, 573 A.2d 951 (App.Div.1990). *137 Any cognate issues, such as the takings ground urged, and causes of action arising therefrom, including one for inverse condemnation, must also be advanced, in the first instance, before the Law Division. See Schiavone Const. Co. v. Hackensack Meadowlands Dev. Comm'n, 98 N.J. 258, 265-66, 486 A.2d 330 (1985).
The reasons we have articulated for concluding that Rule 2:2-3(a)(2) review is inappropriate are without prejudice or limitation on the rights of Infinity and Inner City to challenge the Commission's actions on any basis properly available in a proceeding in lieu of prerogative writs in the Law Division.
Having declined to consider the issues raised, we need not rule upon the federal pre-emption issue framed by Infinity and Inner City. Nevertheless, it seems sufficiently well established as a matter of federal law that the resolutions at issue did not address subject matter in respect of which the states or their subdivisions are precluded from acting.
The FCC's exclusive jurisdiction over television and radio broadcasting is limited to regulating transmission equipment and the interference caused by such equipment. The erection of a structure that passively interferes with a broadcast signal is not a violation of the FCC's authority or of any FCC regulation. See Illinois Citizens Comm. for Broadcasting v. Federal Communications Comm'n, 467 F.2d 1397 (7th Cir.1972). The petitioners in Illinois Citizens sought an FCC injunction against the construction of an office building that they alleged would disturb their reception of broadcast television signals by causing the signals to form "multiple ghost images." Id. at 1398. The FCC denied the petition on the ground that it lacked jurisdiction over building construction. Id. at 1398-99. The Seventh Circuit ruled there was no statutory authority for the FCC to regulate activities "not actually involving the transmission of radio or television signals" simply because, in a way that is "remotely electronic in nature," they might have an effect on signals. Id. at 1400. On the contrary, the Court noted, to determine that the touchstone for FCC authority, namely, "substantially affecting communications," id. at 1399, gave the FCC jurisdiction over building construction "would be to enmesh the FCC in a variety of local considerations and an often complex local regulatory scheme." Id. at 1399-1400. The court thus held that the FCC's jurisdiction was limited to "situations in which the interference" with a radio or television signal is created by actual "transmission facilities," meaning those that emit radio-frequency signals on their own even if unintentionally. Id. at 1401. Construction of an office tower did not satisfy the test, and was beyond the FCC's authority to enjoin. Ibid.
The appeal is dismissed.
NOTES
[*] Since the Commission's actions appealed from herein were taken, its rules and regulations have undergone substantial revision in several stages in 2004. We have referred to the rules and regulations in force at the time of the events described.