EIGHTH & WALNUT CORPORATION ET AL., APPELLANTS, v.
THE PUBLIC LIBRARY OF CINCINNATI AND HAMILTON
COUNTY ET AL., APPELLEES.*

[Cite as Eighth & Walnut Corp. v. Public Library (1977),
57 Ohio App. 2d 137.]

(No. C-77403—Decided December 14, 1977.)

*Messrs. Beirne & Wirthlin,* for appellants.

*Mr. Simon L. Leis, Jr.,* prosecuting attorney, and *Mr. Arthur M. Ney,* for appellees, The Public Library of Cincinnati and Hamilton County, and members of the Board of Trustees of the Public Library of Cincinnati and Hamilton County.

*Mr. John P. Scahill,* for appellee, the city of Cincinnati.

PALMER, P. J. This is an action for declaratory judgment under R. C. Chapter 2721, filed by the plaintiffs, owners of business property located at the northwest corner of Eighth & Walnut Streets in downtown Cincinnati, against the Public Library of Cincinnati and Hamilton County (Library), a free public library established pursuant to R. C. 3375.06, its trustees, and the city of Cincinnati, seeking a

---

*Reporter's Note: An appeal to the Supreme Court of Ohio was dismissed pursuant to a settlement by the parties.

138

declaration that the library and its trustees have no authority to acquire the property of the plaintiffs by eminent domain, nor to employ the city of Cincinnati as its agent for such purpose; to declare that the latter has no authority to acquire such property by eminent domain; and for injunctive relief to prevent the defendants from carrying out plans to acquire the property. To this complaint, answers were filed which, *inter alia*, denied any want of authority to proceed with a condemnation of the plaintiff's property. In due course, motions for summary judgment were filed by each party, supported by a wealth of exhibits, affidavits, depositions and interrogatories. The trial court denied the plaintiff's motion for summary judgment, but granted that of the defendants "* * * for the reason that Ohio Revised Code Sections 719.01(H) and 721.22 clearly provide the statutory authority for the defendant The City of Cincinnati to proceed with the pending appropriation action to acquire the property of the plaintiffs for The Public Library of Cincinnati and Hamilton County."

Plaintiffs bring this appeal from the granting of the summary judgment, asserting in their two assignments of error that the trial court erred in granting defendants' motion and in denying their own when as a matter of law, it is argued, plaintiffs were entitled to a judgment, or alternately, there were genuine issues of material fact which precluded the granting of defendants' motion.

## I.

We note at the outset our disagreement with the conclusion of the trial court that its judgment for the defendants was dictated or permitted by R. C. 719.01 and R. C. 721.22. The former of these statutes provides, in part:

"Any municipal corporation may appropriate, enter upon, and hold real estate within its corporate limits: * * * (H) For libraries, university sites, and grounds therefor; * * *."

The predicate for this grant of authority, insofar as it relates to libraries, seems to us to lie in the authority of a municipality to establish its *own* municipal library pursuant to R. C. 3375.12 *et seq.* or R. C. 715.13. These are

libraries established by and financed within the municipality, and governed by trustees appointed by the mayor of the municipality. The defendant library is not such a municipal library, however, but is concededly a creature of R. C. 3375.06, a *county* free public library and a body politic and corporate, capable of exercising all corporate powers as a separate and distinct entity. R. C. 3375.33. It is governed by trustees appointed by the Court of Common Pleas of the county, financed by a county tax levy (among other private and non-municipal public sources), and is wholly distinct from any municipality, including that city in which its property chances to be located. Although authorized to acquire and hold real property including the right to accept a conveyance of land from the county commissioners, R. C. 3375.08, it has itself no powers of eminent domain, nor does the board of county commissioners have such authority on its behalf.[1] It is, in short, a wholly distinct entity from a municipal free public library.

This being the case, we cannot read into R. C. 719.01 or into R. C. 721.22, the latter of which only authorizes the transfer, lease, or use of municipal property to or by a free public library, the authority to appropriate by condemnation proceedings property directly for the benefit of a county public library. To interpolate this authority into R. C. 719.01(H) would be to find that the defendant city could also appropriate property for transfer to and for the benefit of, say, Harvard University, or any other such private institution, under the grant of appropriation powers "[F]or * * * university sites, and grounds therefor * * *." This obviously was not intended by R. C. 719.01, which enumerates fifteen categories of purposes for which the power of eminent domain may be exercised, all of which involve traditional areas of municipal authority (*e. g.*, improving streets and canals, establishing parks, playgrounds, public offices, prisons, hospitals, levees, bridges,

---

[1]See *Brown* v. *State, ex rel. Merland* (1929), 120 Ohio St. 297, declaring unconstitutional a statute purporting to confer the power of eminent domain for a county library upon the county commissioners. The statute has never been reenacted to remove the constitutional impediment.

sewers, etc.) exercised by the municipality directly for the benefit of its citizens. See, for instance, divisions (M) and (N) of this section, which authorize the municipality to appropriate property of private utilities in order to *itself* operate, respectively, a municipal waterwork and street railway system. To hold otherwise would involve a wholly unwarranted extension of the power of eminent domain, which remains, despite its frequent application and broader areas of usage in recent times, a power whose statutory expressions are to be strictly construed. *City of Cincinnati* v. *Vester* (1930), 281 U. S. 439, 448; *Pontiac Improvement Co.* v. *Bd. of Commissioners* (1922), 104 Ohio St. 447, 454-55.

Nor are we able to avoid the inadequacies of R. C. 719.01 as a statutory authority for the exercise of power contemplated here, by discovering some synergistic qualities at work in the *combination* of these two separate entities, the city and the county library, to attempt the desired condemnation, bearing in mind that here the defendant library entered into a contract with the defendant city in which the latter agreed to act as the agent for the former to acquire the land by condemnation and subsequently to transfer it to the library (see *infra* Section II). It is true that instances occur where the legislature of this state has authorized a combination of political entities to concur in condemning property for public purposes. Examples have included *school district* public libraries,[2] operated by one board of trustees but with condemnation authority vested in another, and agreements for joint construction between cities or a city and county, R. C. 153.61. *Cf., Beal* v. *Elyria* (1971), 26 Ohio Misc. 282. We find no such statutory authority authorizing powers of eminent domain for the joint venture at point here, and none, we conclude, may be assumed by inference.

We, therefore, hold that the trial court erred in relying on R. C. 719.01 and 721.22 as authority for granting summary judgment in favor of the defendants, since these enactments provide no grant of power to municipalities to appropriate property, directly or indirectly, for the

---

[2]See, *e. g.*, G. C. 7638.

purposes of a *county* free public library. Were this the sole issue before us, our foregoing determination would conclude this appeal. But another issue remains to be examined, since the judgment of a trial court may be right although given for the wrong reason, *McCormick* v. *Haley* (1973), 37 Ohio App. 2d 73, 77, and another reason, argued alternatively by the appellees, is urged to sustain the judgment appealed from here.

This second issue, which presents the more vexacious of the questions before us, argues that the actions of the city of Cincinnati and its fellow defendants are sustained under the general powers of the city in implementing its urban renewal plans. If this is so, and may be said to be so within the strictures of Civ. R. 56, then the error of the trial court in applying R. C. 719.01 and 721.22 would have been without prejudice to the appellants, and the result reached by the trial court would have been unexceptionable. Whether this is indeed the case is examined next.

## II.

Before examining this second issue, a recitation of some of the relevant factual background is essential. Thus, the real property in question, owned by appellants and sought to be condemned by the city of Cincinnati, is located within an urban renewal development plan passed by the city at a time antedating all relevant events recited herein and known as the North Frame of the Central Business District. In December, 1970, the Urban Development Department of Cincinnati promulgated plans for the redevelopment of a subarea within the North Frame, known as the Garfield Place area, an area which included the plaintiffs' property at Eighth and Walnut Streets, and which area was included in 1970 as part of the Neighborhood Development Program. By January 28, 1972, the city's Planning Commission had approved a North Frame document as a general plan, including a provision for the Garfield Place area as a property subarea for urban design planning. On February 16, 1972, the City Council approved the North Frame document, and in early 1972 a Garfield Place Urban Design Plan was approved by the appropriate authorities. The objectives of

this plan, as stated by a senior member of the staff of the City Planning Commission in a letter of May 31, 1972, were:

"B. *Objectives.* Eleven objectives are listed, with the primary emphasis on: *preserving the historic residen'ial character; creating new housing opportunities;* creating linkage between the CBD [Central Business District] and Queensgate II [another urban renewal area]; and enriching the environment with open space provisions."

Meanwhile, the plaintiffs, aware of the city's plans for the area, had developed their own plans in 1968 and 1969 for the construction of a residential and commercial high rise building to replace the existing structures on the property. These plans were acknowledged by a senior city planner for the City Planning Commission as in compliance with Urban Design Plan for the Garfield Place area as those plans existed from 1972 until 1975. The plaintiffs assert their continued willingness to construct a residential-commercial building which would comply with the urban renewal plans of the city as those plans existed for the instant property during this period.

In 1975, the city's plans for the Eighth & Walnut property within the Garfield Place area underwent a complete change from the original plan for a residential-commercial mix. The antecedents for this change, however, began considerably prior to this date. Early in 1973, the trustees of the Library inquired of the Prosecuting Attorney of Hamilton County as follows:

"* * * [Can] they [*i. e.,* the trustees] * * * exercise the right of eminent domain in acquiring private property for use of the Public Library to expand the Main Library * * *?

"If the answer is in the negative, can you advise the Board whether they may request the City of Cincinnati to exercise its right of eminent domain to acquire property for Public Library use."

By letter of June 14, 1973, the prosecutor advised the trustees that they did not have the power of eminent domain, but that they might address their inquiries to the

city of Cincinnati. Shortly thereafter the trustees addressed another inquiry to the prosecuting attorney:

"May the Board of Trustees of the Public Library * * * request that the Board of County Commissioners exercise their right of eminent domain in acquiring property for the expansion of the Main Library?"

On September 17, 1973, the prosecutor responded that no statutory authority to accomplish the library's purposes existed, and that the answer to the inquiry was negative. Another inquiry by the trustees seeking to elicit the assistance of the prosecutor in securing the city's exercise of eminent domain authority, provoked the following response by the prosecutor:

"* * * [Y]our present requirement is not for legal assistance but rather for political help and therefore it will be necessary for your Board to somehow interest the City to exercise its power to appropriate property. * * *"

In 1974, the library had its architects prepare plans for the expansion of the library into the space occupied by the plaintiffs' property at Eighth and Walnut Streets and by early 1975 the library had contacted the city of Cincinnati to enlist its aid in condemning the property. The deposition of one James Hunt relates:

"Q. Now, when was that initiated with the City by the library or its representatives? * * *

"A. It would be in early 1975.

"Q. Early 1975?

"A. Shortly after the architects were retained and developed the working project model, that would be the first contact they would have had with the City as far as the design of the Library fitting in with the Garfield Place plan."

The relationship between the city and the library was thereafter formalized as the result of an October 14, 1975, letter from the library to the city requesting the latter to use its powers of eminent domain on the property in question to assist in the library's expansion, by the passage of ordinances amending the previously approved urban renewal plans for the Garfield Place area to provide for

144

a library use of the property in question, and by the execution between the two parties of a "Contract for Services for the Acquisition of Real Estate," wherein the city agreed as follows:

"2. That the City shall use its power of eminent domain, if deemed necessary, to acquire said property for the purpose designated in its Urban Design Plan for Garfield Place * * * , and shall thereafter, pursuant to said plan, convey said real estate to the Public Library of Cincinnati and Hamilton County.

"3. That the City shall have the authority as agent for the Public Library to contract for all outside services necessary for the acquisition of said real property. * * *

"8. That the Public Library shall make available all sums necessary for the acquisition of said real property, relocation payment and loss of property value and a sum of not less than twenty thousand and 00/100 dollars ($20,-000) for services relating to said acquisition."

That the ordinance which accomplished the alteration of the original purpose of the urban renewal project for the Eighth and Walnut Streets property from a residential-commercial use to a use for library expansion was occasioned at the instigation of the library seems demonstrated beyond doubt by the responses on the deposition of the senior city planner of the City Planning Commission:[3]

"Q. Now I assume that this plan [i. e., The Garfield Place area urban renewal plan] was changed in 1975, Mr. Youkilis, at the request of the Board of the Cincinnati, Hamilton County, Library: is that correct?

"A. Yes.

"Q. And that was because, as far as you know, the Library has decided that it wanted to include in its expansion program not only the property which it had ac-

[3] See also the preamble to the contract for services between the city and the library, which candidly recites the foregoing sequence of events, i. e., the alteration of the original plan to provide for library expansion, the request of the library to the city to use its eminent domain powers on behalf of the library, and the conformity of the proposed acquisition of property with the plan "as modified."

quired to the north of the library as it presently stands * * * but also to go south, to include our clients' property at Eighth & Walnut; is that correct?

"A. That was the proposed plan.

"Q. And that was the reason for the change in 1975 in the urban design plan that you have testified to; is that correct?

"A. That is."

Mr. Youkilis also agreed that the city had never made any determination that the plaintiffs' property was itself blighted or a slum, and agreed that the plaintiffs' plans for the redevelopment of their own property into a commercial-residential highrise complied with the urban design plan for the area as it existed before the 1975 amendment of the plan. The library's chief executive officer testified in a deposition that the present library structure of 25,200 square feet sits on land of approximately 40,000 square feet and that the library owns, as a result of previous acquisitions, 48,000 square feet of cleared but undeveloped property to the north, and would add 9,500 square feet if plans to vacate an adjacent alley were accomplished. The plaintiffs' parcels would add 15,000 square feet to this total. A resolution of the City Council to appropriate the plaintiffs' property was accordingly passed on May 26, 1976, and the ordinance authorizing its appropriation was passed in July 1976. The appropriation suit itself was subsequently filed and is now pending.

III.

Based on the foregoing recitation of facts summarized from the wealth of exhibits before us, the following observations of the general state of the law with respect to the municipality's powers in the area of urban renewal seem appropriate.

First, it is unquestionably true, and is not challenged by the plaintiffs, that an Ohio municipal corporation may with perfect propriety exercise its powers of eminent domain in aid of a plan of urban renewal for the elimination of slums or blight within the city and may reconvey the land so condemned for appropriate private or public redevelopment. *State, ex rel. Bruestle,* v. *Rich* (1953), 159

Ohio St. 13. See also *Berman* v. *Parker* (1954), 348 U. S. 26. While a determination by the municipality that the area to be redeveloped through condemnation and resale is a slum or afflicted with blight or deterioration may fairly be said to be a condition precedent to the constitutional exercise of eminent domain powers as conducive to the public welfare under Section 19, Article I, of the Ohio Constitution, *State, ex rel. Bruestle,* v. *Rich, supra,* paragraph 5 of the syllabus, it is clear that not every structure within the area to be redeveloped need itself be blighted. *State, ex rel. Bruestle,* v. *Rich, supra,* paragraph 11 of the syllabus; *Grisanti* v. *Cleveland* (1961), 18 Ohio Op. 2d 143. It is not, therefore, a defense to this or any other attempted exercise of the power of eminent domain for urban renewal purposes for the plaintiffs to insist that their own property is unblighted, when there has been a proper and lawful determination by the city that the area within which the particular property is located is an area of blight or a slum. *Grisanti* v. *Cleveland, supra,* at 154.

Nor does any reason appear to us why a city, having adopted an otherwise lawful plan of urban renewal, could not appropriate property in a blighted area in order to reconvey it to another *public* entity for use as—say—a free public library. If a city may reconvey property condemned under urban renewal to private interests for private redevelopment in conformity with the plan, as concededly it may, then *a fortiori* it may do so to a public agency for a public purpose, as here.[4] *Berman* v. *Parker, supra,* at 34; *State, ex rel. Bruestle,* v. *Rich, supra,* at 27. The critical question, it seems to us, is not whether the city of Cincinnati has the authority to convey appropriated land to the library, or the library to accept and use it, but rather the fundamental inquiry into the propriety, under the *Rich* and *Grisanti* rules of the plan of urban renewal under which the city proposes to exercise its power of eminent domain over the property in question.

---

[4] There is no question as to the authority of the trustees of the library to purchase and accept the transfer of land for library purposes. R. C. 3375.06, 3375.40 (A).

As we have seen, that inquiry into the propriety of the underlying plan for urban renewal, insofar as it relates to the problem at hand, must begin with the legitimacy of a determination by the city of blight in the area sought to be redeveloped to the correction or amelioration of which the renewal plans are addressed. Without such determination of blight, the constitutional basis for the exercise of eminent domain would clearly fail. Similarly, we think it follows that the adoption of a plan of urban renewal *not addressed to the problem of correcting such predetermined blight* would also fail. The one seems necessarily to follow the other; blight is the diagnosis and urban renewal the cure, the latter following inevitably from the former and both required to justify, constitutionally, the surgical technique of eminent domain. It is not dispositive merely to assert that the city has declared the area within which the property in question is located to be a blighted area, and does not determine all legal issues to prove that this step has been properly taken, if it is clearly shown that the city's plans to use the property once acquired are irrelevant to any reasonable design for eliminating the blight.

In this connection, it needs to be observed quite clearly that where a legislative determination of blight has been made, courts are required to and should be zealous in giving such determination by the city great weight. *State, ex rel. Bruestle*, v. *Rich, supra,* at 28; *Grisanti* v. *Cleveland, supra,* at 151-52. Similarly, courts should be reluctant to interfere with any plans for renewal that may be adopted by the city to deal with blight so determined. It is wholly inappropriate for any court to substitute its judgment for that of the legislative body of the city in an area appropriate for legislative determination, or to interpose, without clear and convincing reason to do so, its authority between council and the citizens of the city, to frustrate a determination and plan so adopted.

But none of these principles may be applied so rigidly as to *preclude* a party aggrieved by the actions of a municipality from his right to judicial review; the acts of the city in determining matters of discretionary author-

ity are entitled to great but not conclusive weight. As the *Grisanti* court observed:

"Clearly, if there were evidence of a discretion exercised for ulterior purposes, or by reason of bias or favoritism, or due to bribery or without any basis of fact, then the court would be justified in interfering with the legislative act and setting it aside." *Grisanti* v. *Cleveland, supra,* at 151.

The plaintiffs here were entitled to raise those issues which they feel animadvert the propriety of the exercise of the city's powers and authority in the area of urban renewal. They have done so with evidence summarized in Section II above. The trial court concluded that this evidence raised no genuine issue of material fact which would permit any question to be raised about the right to proceed with the plaintiff's property. We disagree.

We conclude that the evidence before the trial court did indeed raise a genuine factual issue of obvious materiality which could only have been determined after a full evidentiary hearing, to wit: whether the city's 1975 amendment of the Garfield Place area urban renewal plan, which had called for a residential-commercial mix to achieve the stated objectives, was done in aid of its purpose and plan to eliminate slums and blight within the North Frame and subareas, or, on the contrary, was accomplished for other reasons as, for example, solely to accommodate the desire of the library to expand its facilities, irrespective or in spite of the legitimating purpose of eliminating blight. Should the latter be found to have been the case, we think it clear that the constitutional fundament for the exercise of eminent domain by the city must be held to be missing, and the declaratory judgment sought by plaintiffs would become appropriate. The power to condemn property is not alienable, and may not be lent by a condemning authority to others no matter how laudable the objective or result may be. *Cf., State, ex rel. Ford Motor Co.,* v. *District Court* (1916), 133 Minn. 221, 158 N. W. 240. This is not an issue we would presume to decide as a matter of law on the record before us, but

is an issue that, having been raised, must be decided. The cause now before us did not, therefore, present a matter appropriate for summary judgment pursuant to Civ. R. 56, and the trial court erred in granting such judgment.

One more point needs clearly to be made: the genuine issue of material fact arises, as we have said, from the circumstances surrounding the amendment in 1975 of the Garfield Place area plan. Thus, had the 1970 urban renewal plan for the North Frame or the 1972 Garfield Place subarea plains *initially* included plans for the expansion of the library into the area occupied by plaintiffs' structures pursuant to the city's determination that this use was consistent with a purpose to eliminate blight, we could see little prospect for a successful challenge by the plaintiffs of those plans—assuming the propriety of all other factors not immediately relevant here. But the genuine issue arises, we wish to emphasize, because of the several circumstances surrounding the amendment outlined in Section II above, *and not because of the amendment as such.* No inference is intended, and none should be drawn, that a municipality may not exercise its right to review an urban renewal plan once adopted, and alter it from time to time to better effect its purpose of ameliorating blight, without incurring a risk of having its plan judicially invalidated. We decide only that which is before us: that under the particular facts presented to the trial court at this preliminary stage of the proceedings, the instant case was not one for summary judgment pursuant to Civ. R. 56 because of the existence of genuine issues of material fact.

Accordingly, we overrule the plaintiffs' first assignment of error, and sustain the second. The judgment is reversed and the cause is remanded for further proceedings according to law.

*Judgment reversed and cause remanded.*

Bettman and Black, JJ., concur.