CITY OF NORWOOD, Appellee,

v.

HORNEY et al., Appellants.

[Cite as *Norwood v. Horney,* 161 Ohio App.3d 316, 2005-Ohio-2448.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–040683 and C–040783.

Decided May 20, 2005.

318

Manley Burke, Timothy M. Burke, Gary E. Powell, and Daniel J. McCarthy, and Rick G. Gibson, Norwood Law Director, and Theodore E. Kiser, for appellee.

Wood & Lamping, L.L.P., and Robert P. Malloy; and Institute for Justice, Scott G. Bullock, Dana Berliner, William H. Mellor, Robert W. Gall, and David Roland, for appellants.

MARK P. PAINTER, Judge.

{¶ 1} In this eminent-domain dispute, plaintiffs-appellants, Joseph P. Horney, Carol S. Gooch, and Carl and Joy Gamble (collectively, the "owners"), appeal the trial court's judgment allowing defendant-appellee, the city of Norwood, to take property through appropriation. The owners' property was taken to allow the Rookwood Partners, Ltd. ("Rookwood") to build the Rookwood Exchange ("the project").

{¶ 2} There's no place like home. And despite Rookwood's attempts to privately acquire the property, the owners consistently refused to sell. So Rookwood got Norwood involved, and Norwood exercised its right of eminent domain, taking the owners' property. In view of the rights and emotions involved in this dispute, it is no wonder that the owners have bitterly disputed Norwood's (and Rookwood's) actions or that this case is now before us on appeal. Unfortu-

nately for the owners, the current status of the law permits this kind of appropriation. We affirm.

{¶ 3} Under R.C. Chapter 163, Norwood filed an appropriation action in November 2003 against the owners and three other groups of property owners. The appropriation action was initiated to carry out the Edwards Road Corridor Urban Renewal Plan ("the plan"). None of these residents wanted to lose their property, so the owners answered the suit by challenging Norwood's right to take the property.

{¶ 4} The trial court consolidated the appropriation actions and conducted a single trial to determine whether Norwood could take the owners' property. After a five-day hearing, the trial court found that the area in question was deteriorating. Given that finding, the court ruled against the owners and allowed Norwood to proceed with the appropriation. The court then separated the five actions and conducted jury trials to determine what compensation should be paid to the owners. The jury awarded $233,000 as compensation for the taking, and final judgment was entered accordingly. In October 2004, Norwood deposited the amount awarded and costs with the trial court, and Norwood received title to the owners' property.

{¶ 5} On appeal, the owners assign five errors—namely, that the trial court erred in holding that (1) the plan submitted by Kinzelman Kline Gossman complied with Norwood City Code 163.05, (2) Norwood did not abuse its discretion in determining under Norwood City Code 163.02 that the Edwards Road area was "deteriorating," (3) Norwood City Code 163.02(c) was constitutional as applied to this condemnation of the owners' property, (4) the urban renewal plan and the condemnations under that plan were not pretextual, and (5) Norwood did not improperly delegate its eminent-domain powers to Rookwood.

{¶ 6} We review those assignments of error that involve factual determinations under an abuse-of-discretion standard.[1] An abuse of discretion occurs when a city council's decision is unreasonable.[2] A trial court's decision is unreasonable if there is no sound reasoning process that would support that decision.[3]

## I.  *Norwood Grows Up*

{¶ 7} Norwood is a bustling municipality wholly encircled by the city of Cincinnati. Generally, Norwood has enjoyed a healthy industrial base. For

---

1. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597.

2. Id.

3. Id.

example, both the General Motors Assembly Plant and LeBlond Machine Tool Company have called this charming little town home; but they are now gone. The property at issue is situated near the northwest corner of Madison and Edwards Road, just outside of what is now Edwards Road Corridor Urban Renewal Area ("the renewal area").

{¶ 8} In the late 1960s and early 1970s, land was assembled and Interstate 71 was constructed through the renewal area. The renewal area had previously been a residential community containing one- and two-family homes. After completion of I–71, the renewal area substantially changed. The I–71 construction generated multiple avenues of ingress and egress from the interstate, truncated residential streets, eliminated houses, and transformed the area into a conglomerate of residential and commercial properties. Today the surrounding areas have been substantially commercialized. For example, in the regions adjacent to the renewal area, Cincinnatians enjoy the Rookwood Pavilion shopping center and its many upscale chain stores.

## II. The Making of a Taking—A Plan Emerges

{¶ 9} In 2002, Rookwood approached Norwood City Council's development committee, proposing a redevelopment project called the Rookwood Exchange. The project involved constructing a massive conglomerate of stores and offices in place of the owners' properties. The development committee, the city council as a whole, and the Norwood Planning Commission held numerous public meetings regarding the project. Moreover, both the project and the advisability of the development plan were discussed at several town meetings.

{¶ 10} Early on, Rookwood repeatedly pressed Norwood to invoke its eminent-domain powers, but each request was denied. Alternatively, Norwood urged Rookwood to privately acquire the renewal area without legislative intervention. Norwood was so adamant that the city required Rookwood to document its acquisition efforts. But the owners remained recalcitrant, rebuffing Rookwood's purchase offers.

{¶ 11} Rookwood eventually managed to privately acquire all but five of the parcels necessary for the project. The owners represented two of the five holdout parcels. After Rookwood had exhausted all its private options, and it was apparent that the remaining property could not be assembled, Norwood finally agreed to initiate the appropriation process. Under the Norwood City Code, the only way that Norwood could use its eminent-domain powers to obtain the owners' property was if the renewal area was found to be "slum, blighted, or deteriorated" or "deteriorating." [4] So in 2003, the Norwood City Counsel hired

---

4.  Norwood City Code 163.02(b) and (c).

the independent consulting firm of Kinzelman Kline Gossman ("KKG") to conduct an urban-renewal study. As far as the record demonstrates, other than providing KKG with information about the plans for the project, Rookwood did not control either KKG or the outcome of the survey.

{¶ 12} KKG's survey found that the construction of I–71 and the following commercialization of Norwood had had a negative effect on the renewal area as a residential neighborhood. The demographic analysis suggested that the best use of the renewal area was no longer for detached, single- and two-family residences. Further, the study found that development pressure, consumer demand, and the fact that a majority of other owners were willing to sell indicated that continuing piecemeal redevelopment would occur. According to the study, piecemeal development would have an adverse effect on the physical, aesthetic, and functional qualities of the area. The Norwood Planning Commission reviewed the KKG study and considered the existing-conditions survey that was included in it. Upon completion of this review, the commission recommended to Norwood City Council that the development plan proposed by Rookwood be adopted.

{¶ 13} The city council gave the required notice and held a public hearing to consider the plan. At that hearing, KKG representatives presented the results of their study to the public. Many residents and property owners within the renewal area gave testimony concerning the plan and the existing conditions in the plan area.

{¶ 14} In August 2003, the council unanimously passed Ordinance No. 55–2003, which adopted the plan. Ordinance No. 55–2003 was passed as an emergency ordinance "to eliminate deteriorating and deteriorated areas within the City of Norwood and improve safety and traffic conditions and other deteriorating conditions as set forth above and in the plan" by "encouraging their prompt redevelopment." Before passing Ordinance No. 55–2003, the city council considered the KKG study, the recommendation of the planning commission, the comments from the council's public hearing, and the knowledge and experience of the various council members. To comply with the Norwood City Code, Ordinance No. 55–2003 also incorporated by reference the conceptual plans for the project.[5]

{¶ 15} That same day, the council passed Ordinance No. 56–2003, authorizing the mayor to contract with Rookwood for the redevelopment of the area. The contract made Rookwood liable for all of Norwood's costs in exercising its eminent-domain powers. The contract also required Rookwood to demolish the existing structures in the renewal area, to improve street alignments, to eliminate

---

5. Norwood City Code 163.05.

a dead-end street and a limited-access street, and to eliminate other things that had led to the conclusion that the renewal area was deteriorating.

{¶ 16} In September 2003, the council passed a resolution declaring its intent to exercise its eminent-domain power over the owners' property. Two weeks later, the council approved the appropriation of the owners' properties. We now address the owners' assignments of error in order.

## IV. The Plan's Requirements

{¶ 17} The owners' first assignment is that the trial court erred in finding that the plan submitted by KKG complied with the Norwood code. Thus, the owners argue that this basic statutory violation invalidated the plan and did not allow it to serve as the basis for a taking. But the information provided to the commission and the council was substantially the same as that required by the Norwood code.

{¶ 18} Under the Norwood code, the planning commission is charged with preparing urban renewal plans.[6] Once completed, the plan is then submitted to the city council.[7] The city council then reviews the plan and sends it back to the commission with recommendations.[8] Norwood City Code 163.05 provides that "[a]ny renewal plan hereafter prepared shall be prepared in such detail as to clearly set forth sufficient information to permit the planning commission to exercise its power of approval or disapproval under Ohio R.C. 713.02."[9] R.C. 713.02 grants the planning commission power to oversee the "systematic planning of the municipal corporation" and to make recommendations on a variety of planning issues to the municipality's legislative body.

{¶ 19} Courts will invalidate municipal actions that do not comply with codified procedures.[10] The burden of proving an appropriation's illegality is on the property owners.[11] As the Ohio Supreme Court has pointed out, this burden is a formidable one to overcome at trial.[12] Courts are cognizant of the impor-

---

6. See Norwood City Code 163.04.

7. Id. at 163.04(b).

8. Id. at 163.06(a).

9. (Emphasis added.) Id. at 163.05.

10. See *Brown v. Dayton* (Dec. 11, 1998), 2d Dist. Nos. 16875 and 16876, 1998 WL 852636, reversed on other grounds, 89 Ohio St.3d 245, 730 N.E.2d 958.

11. R.C. 163.09(B).

12. See *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

tance of urban redevelopment and generally give the definition of "blighted area" a liberal interpretation.[13]   Therefore, unless Norwood's conclusion—that the appropriation was necessary—was based on no sound reasoning process, we will not disturb that conclusion.[14]

{¶ 20} The requirements for submission of an urban renewal plan are set forth in Norwood City Code 163.05.  The owners argue that the plan in this case did not comply with the Norwood code because it lacked (1) a statement showing the standards or population densities and other conditions of the proposed project, (2) a delineation of areas of land acquisition, (3) a statement of the relationship of the plan to defined objectives of the city, (4) a statement indicating the controls to be placed on the area as a result of the redevelopment project, (5) a financial plan, and (6) a relocation plan.[15]

{¶ 21} The trial court found that the KKG plan did not include these items. But it also found that the city council had amended the plan to include the conceptual plan for the project, and that the council had approved the redevelopment contract at the same meeting where council had approved the plan.  The trial court held that this amounted to substantial compliance with the code requirements.  We agree.

{¶ 22} The owners urge this court to read the elements of Norwood City Code 163.05 as being exclusive and mandatory.  In their brief, the owners assert that these "matters must be covered in the urban renewal plan * * *."   But this interpretation misses the mark.  This "can't see the forest for the trees" approach turns a blind eye to the overall goal of an informed decision.

{¶ 23} For example, although parts of the original plan were missing, the amended plan did contain virtually all the relevant considerations outlined in Norwood City Code 163.05, including historic and current land-use graphics; redevelopment objectives for the area including recommended design standards; a recommendation that Norwood enter into a comprehensive redevelopment contract to establish the general scope, character, and phasing of a redevelopment plan;  a financial plan that suggested the use of tax-increment financing for the public improvements in the area;  and an indication that Norwood's planned-unit-development regulations would allow Norwood to control the quality and general character of any proposed development project within the plan area.

13. Id.

14. Id.

15. See Norwood City Code 163.05(a)(2) through (7) and 163.05(b).

{¶ 24} In passing the renewal plan, the commission believed, as do we, that submission of this information met the requirements of Norwood City Code 163.05. The trial court correctly concluded that the plan, when combined with the redevelopment agreement, provided the required information under the code.

{¶ 25} Finally, the owners claim that even if the redevelopment contract did meet the requirements of the Norwood code, it was too late in the process to save the validity of the plan. But Norwood City Code 163.06 provides that "[t]he approval of the commission shall also constitute its approval of those matters placed under its jurisdiction by Ohio R.C. 713.12." In this case, the commission gave its approval for the urban renewal project, which was a matter properly within its jurisdiction. Moreover, the city council—not the commission—had authority to make the final decision about the adoption of the urban renewal plan.[16] The plan and the amendment of the plan were adopted by a unanimous vote. And we are satisfied that that vote was based on information substantially similar—if not identical to—that required under Norwood City Code 163.05, and was a product of a sound reasoning process. We therefore overrule the owners' first assignment.

### V. Norwood's Deteriorating Areas

{¶ 26} In their second assignment, the owners argue that the trial court erred in holding that the city did not abuse its discretion in determining that the renewal area was "deteriorating" under section Norwood City Code 163.02. The premise of this assignment of error is that (1) the existing-conditions survey interfused the definition of a "slum, blighted or deteriorating area" with the definition of a "deteriorating area," (2) the existing-conditions survey contained a multitude of errors, and (3) the plan area did not meet the definition of a deteriorating area. As a result, the owners claim that the council could not have found, using a sound reasoning process, that the urban renewal area was a "deteriorating area." Not so.

{¶ 27} Where the designation of an area as "blighted" indicates that there is a sound reasoning process by which it has been declared "blighted," and the resulting condemnation is for the purpose of eliminating that blight, the constitutional basis for the use of eminent domain exists.[17] In this case, the trial court found that council had abused its discretion in determining that the renewal area was slum, blighted, or deteriorated. Nevertheless, the court found that the

---

16. See Norwood City Code 163.07.

17. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597.

council had not abused its discretion in finding that the renewal area was "deteriorating."

{¶ 28} Under Norwood City Code 163.02, "deteriorating" is defined in these terms:

{¶ 29} "An area, whether predominantly built up or open, which is not a slum, blighted or deteriorated area, but which because of incompatible land uses, nonconforming uses, lack of adequate facilities, faulty street arrangement, obsolete platting, inadequate community and public utilities, diversity of ownership, tax delinquency, increased density of population without commensurate increases in new residential buildings and community facilities, high turnover in residential or commercial occupancy, lack of maintenance and repair of buildings, or any combination thereof, is detrimental to the public health, safety, morals and general welfare, and which will deteriorate or is in danger of deteriorating, into a blighted area."

{¶ 30} Essentially, the issue for this court to determine is whether Norwood abused its discretion in finding that the area was in danger of deteriorating into a blighted area. We need not conclude that this court would reach the same judgment as Norwood, only that there was a sound reasoning process and that the city council did not abuse its discretion. In our system of government, we require judicial deference to be given to a city council's decisions.[18] This is so because legislatures are better able to assess what public purpose should be advanced by the exercise of eminent domain.[19]

{¶ 31} The Ohio Supreme Court requires that we give the definition of "blighted area" a liberal interpretation.[20] Once a legislative determination of blight has been made, "courts are required to and should be zealous in giving such determination by the city great weight."[21] We will not substitute our judgment for that of the legislative body of the city in an area appropriate for legislative determination.[22] Nor will we interpose, without clear and convincing reason to do so, our authority between council and the citizens of the city to

18. *Hawaii Housing Auth. v. Midkiff* (1984), 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186.

19. Id.

20. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597.

21. *Eighth & Walnut Corp. v. Pub. Library of Cincinnati* (1977), 57 Ohio App.2d 137, 11 O.O.3d 128, 385 N.E.2d 1324, citing *Bruestle v. Rich* (1953), 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778.

22. Id.

frustrate a determination and plan so adopted.[23] Our role in determining whether governmental power has been exercised for a public purpose is an extremely narrow one.[24]

{¶ 32} A similar situation arose in *Dayton v. Kuntz* where the city of Dayton had appropriated property under an urban renewal plan.[25] In that case, Dayton had not made a specific finding that the area was deteriorating, but the court implied such a finding from Dayton's action in, among other things, approving the urban renewal plan.[26] There, the court reviewed a statute similar to Norwood's and upheld the city's conclusion that the area was deteriorating.

{¶ 33} More recently, the city of Toledo acquired land under an urban renewal plan for the purpose of expanding a Jeep plant.[27] The court stated that "deteriorated structures are not the only consideration when deciding whether an area is blighted; other factors such as 'inadequate street layouts', 'unsanitary and unsafe conditions', * * * 'substantially decreased tax or fair market values,'" and the improvement of the economic welfare of the people of the community are also factors to be considered.[28] It is with these guiding principles in mind that we analyze the owners' argument in this case.

{¶ 34} The owners' claim focuses mainly on the assessment of existing conditions. But existing conditions are not the only factor to be considered. Norwood City Code Chapter 163 sets forth the process by which Norwood can undertake urban renewal activities. Under the code, an urban renewal project is defined as "undertakings and activities of the City of Norwood * * * in an urban renewal area for the elimination and for the prevention of the development or spread of blight, and may involve clearance and redevelopment in an urban renewal area * * * in accordance with such urban renewal plan to the full extent of and in accordance with the rights, powers and authority of the City." [29]

{¶ 35} The code also defines a "project area" or an "urban renewal area" to mean "a slum, blighted, deteriorated or deteriorating area or any combination or

---

23. Id.

24. See *Goldstein v. Cincinnati* (Apr. 8, 1981), 1st Dist. No. C–800802, 1981 WL 9717.

25. (Mar. 3, 1988), 2d Dist. No. 10513, 1988 WL 28104.

26. Id.

27. See *Toledo v. Kim's Auto & Truck Serv., Inc.*, 6th Dist. No. L–02–1318, 2003-Ohio-5604, 2003 WL 22390102, at ¶ 13.

28. Id., quoting Toledo Municipal Code 1183.03(g).

29. Norwood City Code 163.02(k).

part thereof which Council designates as of a character and size appropriate for urban renewal activities and for which an Urban Renewal Plan is proposed or prepared." [30]

{¶ 36} Thus it is apparent from Norwood's definition of "deteriorating" that the city council may properly conduct urban renewal activities in an area that meets either the definition of a "slum, blighted or deteriorated area" or a "deteriorating area."

{¶ 37} So the key inquiry is whether the urban renewal area as a whole meets the definition of "deteriorating," not whether any individual structure or house exhibits these characteristics. In making the determination in this case that the renewal area was in danger of deteriorating, the council considered (1) the increase in traffic congestion around the existing Rookwood projects, (2) the negative impact of noise from the traffic on Edwards, Edmondson, and I–71, (3) the high diversity of ownership of small parcels of land in the renewal area, (4) the safety issues arising from the truncating or dead-ending of Dacey and Garland Avenues, which created inadequate turnarounds, (5) the numerous curb cuts and driveways onto Edwards and Edmondson Roads that required vehicles to either enter or leave the driveways by backing onto or off Edwards or Edmondson Road, (6) the widening of Edmondson Road, which was required to accommodate traffic from the I–71 exit ramp, and which resulted in a substantial reduction in the front yards along Edmondson Road—in some cases reducing front yards to only a few feet between the road and the front steps, and (7) the negative impact on the quality of residential living in the area at night resulting from the lights from adjacent developments.

{¶ 38} After an extensive review of these factors, the trial court concluded that these conditions could lead to "impairment of sound growth, and an economic liability and menace to the public welfare." The trial court, giving the city council its due deference, then found that the owners had not met their burden of proving that there was no sound reasoning process supporting Norwood's decision or determination that the area was "deteriorating" under Norwood City Code 163.02(c).

{¶ 39} Given these facts, the Norwood City Council had discretion to conclude that the unique combination of factors present in the urban renewal area was "detrimental to the public health, safety, morals and general welfare" and that the area "[would] deteriorate, or [was] in danger of deteriorating, into a blighted area."

---

**30.** Norwood City Code 163.02(d).

{¶ 40} The safety issues and traffic concerns causing unsafe conditions, the predominance of inadequate street layout and faulty lot layout, and the diversity of ownership were all especially relevant factors. This was true even if some of the same individual conditions could probably have been found in other parts of Norwood and the surrounding area. Accordingly, considering the evidence, and giving the city council great deference, we overrule the owners' second assignment.

## VI. The Constitutional Composition of the Norwood Code

{¶ 41} The owners' third assignment of error asserts that if Norwood City Code 163.02(c) does allow the urban renewal designation and condemnation of the Edwards Road area, then that enactment is unconstitutional. The owners claim that the powers of eminent domain may not be used to eliminate "deteriorating conditions," only actual conditions of blight. Thus, they claim that the underlying purpose for the appropriation in this case—the remediation of deteriorating conditions—did not constitute a valid public purpose.

{¶ 42} The Fifth Amendment to the United States Constitution requires that for government to acquire private property using eminent domain, the property must be taken "for public use" and compensation paid. Section 19, Article I of the Ohio Constitution provides that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare" and that "where private property shall be taken for a public use, a compensation therefor shall be made in money, or first secured by a deposit of money."

{¶ 43} The United States and Ohio Supreme Courts have interpreted the phrase "taken for public use" as being equivalent to the phrase "taken for the public welfare." [31] Where the exercise of eminent domain is rationally related to a conceivable public purpose, the United States Supreme Court has never held a compensated taking to be prohibited by the public-use clause.[32] If the primary purpose for the exercise of the power of eminent domain is "to acquire the property for 'the public welfare' within the meaning of Section 19 of Article I of the Constitution, the power may be exercised even where there may be an incidental nonpublic use of the property or benefit from its taking." [33]

---

31. See *Hawaii Hous. Auth. v. Midkiff* (1984), 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186; *Bruestle v. Rich* (1953), 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778.

32. Id.

33. *Bruestle v. Rich* (1953), 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778.

{¶ 44} After an extensive right-to-take hearing, the trial court followed the Ohio and United States Supreme Courts in holding that a taking under an urban renewal plan is for a valid public purpose and is constitutional.[34]

{¶ 45} In *State ex rel. Ryan v. Gahanna City Council*,[35] the Ohio Supreme Court upheld the appropriation of private property for the creation of a commercial or industrial park as part of an urban development plan despite the absence of a finding of blight. The Gahanna renewal plan's objective was the acquisition of land for the purpose of demolishing "substandard" structures, removing blighting influences, and establishing the use of an area for an industrial office park.[36] The authorizing ordinance upheld in *Gahanna* further established guidelines for urban renewal and redevelopment "in a blighted area for the elimination *and for the prevention of the development or spread of blight*."[37] (Emphasis added.) Although the issue in *Ryan* involved the propriety of a bond arrangement, the court nonetheless noted that urban renewal and economic development are proper public purposes in the context of eminent-domain actions.[38]

{¶ 46} In *Dayton v. Kuntz*,[39] the court upheld a definition of "deteriorating" that was virtually identical to Norwood's definition of "deteriorating."[40] The holding in *Kuntz* was that a council's "decision to appropriate blighted or deteriorating land for an urban renewal project intend[ing] to rejuvenate a downtown area is conducive to the public welfare and constitutes a 'public use' for purposes of Article I, Section 19."[41] We agree with the rationale in *Kuntz* and so hold that the Norwood urban renewal plan's goal of remediation of deteriorating conditions was a valid public use. Consequently, we overrule the owners' third assignment of error.

---

34. *See AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597; *Bruestle v. Rich* (1953), 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778.

35. (1984), 9 Ohio St.3d 126, 9 OBR 377, 459 N.E.2d 208

36. Id.

37. Id.

38. Id.

39. (Mar. 3, 1988), 2d Dist. No. 10513, 1988 WL 28104.

40. See Dayton Ordinance No. 40.09(C)(1)

41. Id.

### VII. A Pretextual Taking—Façade or Legitimate?

{¶ 47} The owners' fourth assignment charges the trial court with failing to hold that the urban renewal plan and the condemnations pursuant to it were pretextual.

{¶ 48} Pretextual takings—when the real purpose of the condemnations are different from the stated ones—are illegal and widely invalidated. The owners argue that the renewal plan was accomplished to acquire eminent-domain authority and tax-increment financing for the building of the Rookwood Exchange, rather than to eliminate blight. In support of the owners' pretext argument, they cite *Eighth & Walnut Corp. v. Pub. Library of Cincinnati.*[42] There, the property owners filed a declaratory-judgment action against the Public Library of Cincinnati and Hamilton County seeking a declaration that the defendants had no authority to acquire their property by eminent domain, as well as injunctive relief to prevent appropriation of the property. As with the present case, the property was located within an urban renewal development area.

{¶ 49} The trial court granted summary judgment to defendants, finding that the purpose of the urban renewal plan was to eliminate slums and blight within the urban renewal area. On appeal, we reversed, holding that the property owners "did indeed raise a genuine factual issue of obvious materiality" whether the appropriation was "done in aid of [Cincinnati's] purpose and plan to eliminate slums and blight" or was accomplished "solely to accommodate the desire of the library to expand its facilities, irrespective or in spite of the legitimate purpose of eliminating blight."[43] Most significantly, we held that an issue of fact existed "which could only be determined after a full evidentiary hearing."[44]

{¶ 50} Here, the trial court conducted the full evidentiary hearing contemplated by *Eighth & Walnut.* The court found that the council "went through an extended process, including public hearings, to determine the Area was deteriorating and that the plan, including the proposed Rookwood Exchange project, would eliminate this deteriorating condition." The mayor of Norwood testified that the city could not afford to eliminate the deteriorating conditions and the dead-end streets, to create the public parking, to eliminate the multiplicity of curb cuts on Edwards and Edmondson Roads, or to deal with the other conditions that existed in the renewal area without the commitment of Rookwood. Norwood used its eminent-domain powers because it was the only way to effectuate the

---

42. (1977), 57 Ohio App.2d 137, 11 O.O.3d 128, 385 N.E.2d 1324.

43. Id.

44. Id.

urban renewal project. There was no pretext. We overrule the owners' fourth assignment.

### VIII. Private Abuse of Eminent Domain?

{¶ 51} The owners' fifth and final assignment is that the trial court erred in holding that Norwood did not improperly delegate its eminent-domain powers to Rookwood. The owners' argument in this respect is that Norwood improperly delegated its power of eminent domain to Rookwood Partners by entering into the redevelopment contract. According to the owners, the relevant inquiry is whether the city gave a private party the ability to decide when and if the city would initiate the use of eminent domain.

{¶ 52} Eminent domain is an inalienable government power. Both federal and Ohio law forbids government bodies to delegate this power to a private party.[45] We have held that "[t]he power to condemn property is not alienable, and may not be lent by a condemning authority to others no matter how laudable the objective or result may be."[46] Where the final decision to exercise legislative authority rests with the municipality's city council, then there can be no delegation of municipal legislative authority.[47]

{¶ 53} In *Singer v. Troy*,[48] the city of Troy enacted an ordinance mandating that if neighboring landowners protested a zoning amendment, the petition to amend had to be approved by a supermajority (three-fourths of city council). Plaintiff argued that Troy had unlawfully delegated its legislative power (zoning authority) to any protesting landowner. But the court held that such a process did not constitute an improper delegation because council still had the final authority to decide whether to approve or reject any amendment.[49]

{¶ 54} The owners argue that the holding in *Singer* is inapposite because it has nothing to do with the delegation of eminent-domain authority. But the proper inquiry is whether the Norwood City Council retained the final authority to decide whether to approve or reject the use of its eminent-domain powers. It did.

---

**45.** See, e.g., *Contributors to Pennsylvania Hosp. v. Philadelphia* (1917), 245 U.S. 20, 38 S.Ct. 35, 62 L.Ed. 124.

**46.** *Eighth & Walnut Corp. v. Pub. Library of Cincinnati* (1977), 57 Ohio App.2d 137, 11 O.O.3d 128, 385 N.E.2d 1324.

**47.** See *Singer v. Troy* (1990), 67 Ohio App.3d 507, 587 N.E.2d 864.

**48.** Id.

**49.** Id.

{¶ 55} The redevelopment contract contained multiple provisions showing that Norwood retained its own decision-making powers when it came to the potential use of eminent domain to acquire properties needed for the redevelopment of the area. Page 10 of the redevelopment contract provided the following:

{¶ 56} "At the request of Redeveloper, City will use its reasonable efforts to promptly assist Redeveloper to acquire the Ohio parcels, Condemnation Parcels or any portion of the TIF District not closed with Redeveloper due to seller's default, and that at the request of Redeveloper, and *if approved by City Council,* City will use its power of eminent domain to negotiate to acquire or facilitate the acquisition by the City of the Condemnation Parcels * * *." (Emphasis added.)

{¶ 57} The contract also stated, "City agrees at the request of Redeveloper, *and if approved by City Council,* City will use its eminent domain powers * * *." (Emphasis added.) Thus, the redevelopment contract made it clear that the Norwood City Council retained the final decision whether to use or to initiate eminent domain. Norwood did not commit to use its power of eminent domain in the contract. The provisions acknowledged that if council chose to adopt, or decided not to adopt, an ordinance initiating the eminent-domain process following the adoption of an urban renewal plan, council could do so. Moreover, had Norwood elected not to exercise its eminent-domain powers, it would not have been a breach of the redevelopment agreement entitling Rookwood to seek either damages, mandamus, or specific performance. Instead, that failure would have only triggered a contingency that would have allowed the developer to withdraw from the agreement.

{¶ 58} In *Wayne Cty. v. Hathcock,*[50] the Michigan Supreme Court held that the taking by eminent domain and transfer to a private entity was only appropriate in one of three circumstances: "(1) where 'public necessity of the extreme sort' requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property is selected because of 'facts of independent public significance,' rather than the interests of the private entity to which the property is eventually transferred."[51]

{¶ 59} There, the court struck down a seizure because the only benefit of the plan was the private entity's financial benefit. But here, Rookwood agreed that the project "shall be constructed and completed in accordance with the final plan approved by City Council." Rookwood also agreed to exercise its powers "in a fair and equitable manner" and to "act in good faith and cooperate with

---

50. (2004), 471 Mich. 445, 684 N.W.2d 765.

51. Id. at 476, 684 N.W.2d 765, citing *Poletown Neighborhood Council v. Detroit* (1981), 410 Mich. 616, 304 N.W.2d 455 (Ryan, J., dissenting).

[Norwood] in pursuit of the objective of this Agreement." The objectives of the agreement included creating jobs, attracting visitors, enhancing Norwood's tax base, and producing revenue to help Norwood with government and social services. And as we have already mentioned, the plan included parking lots intended for public use. Rookwood remained accountable to the public. Thus, even under the analysis used in *Wayne Cty.*, this taking was permissible.

{¶ 60} Because Norwood retained ultimate control over the decision to use its eminent-domain powers, we overrule the owners' fifth assignment. Accordingly, we affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and GORMAN, J., concur.